**In re COFFEE CUPBOARD, INC., Warehouse Outlet of Whitestone, Inc., Bazaar De La Cuisine, Inc., Allvend Industries, Inc., Warehouse Outlet of Flushing, Inc., Warehouse Outlet of New Rochelle, Inc., Debtors,**

**COUNTRYWIDE METAL FINDERS, INC., Plaintiff,**

**v.**

**COFFEE CUPBOARD, INC., et al., Defendants.**

**Bankruptcy Nos. 181–13520–260, 181–13522–260, 181–13523–260, 181–13524–260, 181–13525–260 and 181–13527–260.**

**Adv. No. 182–0325.**

United States Bankruptcy Court, E.D. New York.

Oct. 5, 1983.

Hartley James Chazen and Ballon, Stoll & Itzler, New York City, for plaintiff.

Louis P. Rosenberg, Brooklyn, N.Y., for debtors.

DECISION AND ORDER

CONRAD B. DUBERSTEIN, Bankruptcy Judge.

This matter is before the court on a motion by the debtor/defendant to dismiss,

pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, the plaintiff's complaint.

The defendants, Allvend Industries, Inc., and its operating subsidiaries, filed petitions for reorganization under Chapter 11 of the Bankruptcy Code in 1981. The plaintiff corporation, Countrywide Metal Finders, Inc., subsequently commenced the subject adversary proceeding to assert a security interest in the property, assets, and related proceeds of the defendants, have the automatic stay under 11 U.S.C. Section 362 lifted, and foreclose its alleged lien.

A trial was commenced in this court on November 3, 1982. At the close of the plaintiff's case, the defendants made the within motion, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, for an involuntary dismissal of the plaintiff's complaint, asserting that the evidence presented was insufficient as a matter of fact and law to justify a verdict for the plaintiff. The court reserved decision on the motion and directed the parties to submit memoranda of law in support of their respective positions.

I

FACTS

At the trial, the plaintiff's president, Martin Stern, and its vice-president, John Worrilow, both testified for the plaintiff. As individuals, it appears Stern and Worrilow had been the defendants' major creditors, advancing monies in excess of $500,000. As early as 1976, Worrilow advanced monies to Allvend and its subsidiaries. Between April and October of 1976, Worrilow advanced by wire transfer and checks a total of $239,000. Allvend's principal, Edward Weiss, assured Worrilow that an agreement would be worked out where the cash proceeds from Christmas 1976 sales from Allvend's warehouse outlets would be used to repay him by December, 1976. Later, Worrilow and Weiss agreed that Worrilow would not receive payment when that time arrived. Worrilow believed his advances to Allvend were secure since he would be receiving additional interest pay-

ments for those advances. In fact, Worrilow made further loans of $159,000 in 1977, $65,000 in 1978 and $204,500 in 1979. Although the parties had an oral agreement, Worrilow constantly demonstrated his concern to Weiss for security. Worrilow testified that during that period he thought the inventory in Allvend's warehouse was his property.

It was not until April 16, 1979 that Worrilow received the first document concerning interest owed to him, which provided for $50,150 from Allvend for interest on the loans from 1976 to 1979 at a rate of 7% above the then prevailing prime rate available from New York banks.

Stern testified that he entered into an agreement with the defendants in October of 1979 to acquire a security interest in property belonging to the defendants and file UCC–1 statements. This action was allegedly a result of Stern's desire to obtain security for previous loans he had made as an individual to the defendants.

Stern had made his first loan to defendants on March 19, 1979 for the sum of $18,000. Further loans were made by Stern to the defendants in the ensuing months. An additional $25,000 was advanced on March 28, 1979 and $4,000 on May 25, 1979. As of March 20, 1980, Stern had advanced a total of $157,141. Subsequently, Stern received repayments of principal of $84,632, leaving a principal balance of $72,509.

Stern received promissory notes in return for this indebtedness in March of 1980. Originally, however, Stern was allegedly promised stock in Allvend, which he never received.

In a letter dated April 16, 1981 Stern and Worrilow instructed Gerald Broder, an attorney, to prepare security agreements running to the plaintiff, Countrywide, in connection with loans and advances they had previously made to Allvend and its subsidiaries. Countrywide had been formed on April 13, 1981, with Stern and Worrilow as officers and sole stockholders, for the apparent purpose of assigning their interests in Allvend to a corporate entity. UCC–1 financing statements were executed by the

defendants and the plaintiff Countrywide, as assignee of Stern and Worrilow, and filed in the State of New York. Worrilow testified that it was his understanding that he was "protected" as a secured creditor as a result of the filing of these financing statements. No other documents were specifically drawn to represent a security agreement between the parties.

The plaintiff, Countrywide, asserts that it has made out a prima facie case demonstrating the existence of a security agreement by showing the existence of various documents which when viewed together constitute a valid security agreement. Therefore, it argues the court must deny the defendant's motion. It contends that the requirements for enforcing a nonpossessory security interest (a writing, the debtor's signature and a description of the collateral) can be found in this situation by examining the totality of the evidence presented and do not have to be found within the "four corners" of a security agreement or any other single document. Instead, Countrywide insists that any group of writings adequately describing the collateral, bearing the debtor's signature, and evidencing that a security interest was agreed upon will satisfy the requirements for a security agreement found in the UCC section 9–203.[1]

The documents which the plaintiff contends compromise a valid security agreement include the following:

1. A form security agreement, blank except for the signature of Weiss and two witnesses, neither of who is an agent of the plaintiff. (plaintiff's ex. 1)

2. A UCC financing statement signed by Stern as an officer of the plaintiff and by Weiss as an officer of the defendant stating in very general terms the property covered by the alleged security agreement. That property was described as goods, wares, merchandise, inventory, furniture, fixtues, chattles (sic), accounts receivable, vehicles and trucks. (plaintiff's ex. 10)

3. The letter dated April 16, 1979 by Worrilow and Stern directing Broder to assign their debts to the plaintiff and to prepare security agreements in connection with those debts. (plaintiff's ex. 2)

4. A hand written letter dated April 16, 1979 from Weiss to Worrilow making reference to an unspecified security agreement. (plaintiff's ex. 3)

5. A letter dated January 18, 1980, addressed to Tom's Foods and signed by Stern in his capacity as an officer of Countrywide in which Countrywide seeks an agreement from Tom's Foods, a judgment creditor of the defendants, acknowledging the superior interest of Tom's Foods in the defendant's property in return for a promise by Tom's Foods not to execute on its judgment. There is no indication that Tom's Foods ever acceded to this agreement.

The defendants maintain that the mere filing of UCC–1 financing statements and the aggregate of the plaintiff's other aforementioned documents do not constitute a "writing" for UCC section 9–203 purposes and that their motion should therefore be granted.

## II

### ISSUES

A. Does UCC section 9–203(1)(a) require a separate integrated security agreement or may two or more documents when viewed as a whole constitute such an agreement?

B. If a separate integrated security agreement is not required, has the plain-

---

1. Section 9–203 provides in relevant part:
(1) Subject to the provisions of Section 4–208 on the security interest of a collecting bank and section 9–113 on a security interest arising under the Article on Sales, a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral . . .

tiff presented evidence sufficient to support a valid enforceable security interest in the defendant's property?

## III

## DISCUSSION

### A

The threshold issue to be considered is whether a separate formal security agreement under UCC section 9–203(1)(b) is required in order to create an enforceable security interest in the defendant's property. If such a formal agreement is required, then the question of whether a "security agreement" exists under the present facts (UCC–1 financing statements and various other documents) is not necessary.

In 1980 the Third Circuit held in *In re Bollinger,* 614 F.2d 924 (3d Cir.1980) that certain outside writings which referred to a security agreement the parties intended to create were sufficient to form such a security agreement. This was conditioned on the existence of certain key elements central to any security agreement. First, there must be a writing. Second, it must be signed by debtor. And, third, that writing must contain a description of the collateral. This ruling is in accord with an earlier First Circuit decision, *In re Numeric,* 485 F.2d 1328 (1st Cir.1973), in which it was held that a "(s)eparate formal document entitled 'security agreement' is not always necessary to satisfy the signed writing requirement of Section 9–203(1)(a)" provided there is a "writing or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon...." at 1331.

Notwithstanding this willingness by other circuits to recognize the existence of security agreements outside of the "four corners" of a traditional security agreement, New York law must still govern the standards applied to the finding of a security agreement.

■ A careful review of the pertinent statutory and case law from New York does not reveal any authority that either expressly supports of contradicts the conclusions reached in *Bollinger* and *Numeric.* Accordingly, this court gives deference to those two opinions and holds that a security agreement may be found through a collective examination of various documents none of which could, standing alone, satisfy the requirements for a security agreement found in UCC section 9–203.

### B

Assuming that a separate formal agreement is not required by section 9–203(1)(c), the second issue to be addressed is whether the plaintiff has presented evidence sufficient to resist the defendant's motion. This court finds that it has not and therefore grants the defendant's motion to dismiss.

The source of this court's authority to so dismiss is found in Rule 41(b) of the Federal Rules of Civil Procedure which states in relevant part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).

Rule 52(a) states in relevant part:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.

In compliance with Rule 52(a) this court makes the following findings of fact and conclusions of law.

*Findings of Fact and Conclusions of Law*

■ As previously stated the following elements must be present in order for a

valid security agreement to exist. First, there must be a writing expressing a present intent to create a security interest. Second, there must exist a signature of the debtor affirming that intent. And, third, an adequate description of the collateral must exist. This court has reviewed all of the aforementioned documents submitted by the plaintiff in support of its argument that these elements can be found through a collective observation of those documents, and does find evidence sufficient to support such a conclusion.

█ Throughout those documents there appear various references to security interests and agreements yet nowhere in those documents is there any language that could specifically be said to constitute a present intent to create a security agreement nor is there any adequate description of collateral.

In the letter of April 16, 1979 from Weiss to Worrilow and the letter addressed to Tom's Foods dated January 18, 1980 and signed by Stern, reference is made to some unspecified security interest without any mention of the collateral. In addition, none of the other documents provided by the plaintiff as proof of a security interest present any evidence connecting specific collateral to these alleged security interests. Indirect references to various types of property found in the UCC financing statement submitted as evidence and signed by the parties are too vague to constitute an adequate description of collateral. (*See, In re Fuqua,* 461 F.2d 1186 (10th Cir.1972) in which it was held that a security agreement purporting to cover all personal property of the debtor was too broad to be given effect.)

Neither do any of the other documents firmly acknowledge the actual existence of a writing expressing present intent to create a security agreement. The letter of April 16, 1979 from Worrilow and Stern directing Broder to assign their interest to the plaintiff and to prepare security agreements does not constitute evidence that such agreements were ever prepared. It is merely directory. Like the previously mentioned letter of April 16, 1979 from Weiss to

Worrilow and the January 18, 1980 agreement signed only by Worrilow it does not sufficiently express a present intent to create a security interest to protect advances made to the debtor by Stern and Worrilow which may have been later assigned to the plaintiff.

Finally, the blank security agreement containing only Weiss' signature is essentially meaningless with respect to the requirements of UCC section 9–203(1)(a) since it neither describes the collateral nor the intent to create a security interest with any given party and is not worthy of further consideration.

Viewed collectively the above documents suggest the possible existence of some type of security agreement in some unspecified property, but there is simply insufficient evidence to support a firm conclusion that the plaintiff has a valid security interest in specific property of the defendant. Accordingly, this court finds no cause for proceeding any further with this matter and directs that the defendant's motion to dismiss the plaintiff's complaint pursuant to FRCP 41(b) be granted.

IT IS SO ORDERED.